**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

| | | |
|---|---|---|
| **DEBORAH COFFEY ICENHOUR,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:19CV00033 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **THE TOWN OF ABINGDON, ET AL.** | ) | By:  James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Thomas E. Strelka, L. Leigh R. Strelka, N. Winston West, IV, and Brittany M. Haddox,* STRELKA LAW OFFICE, PC, *Roanoke, Virginia, for Plaintiff; Ramesh Murthy and Cameron S. Bell,* PENN, STUART & ESKRIDGE, *Abingdon, Virginia, for Defendants.*

In this employment-related civil case asserting claims under the Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and 42 U.S.C. § 1983, along with two state-law defamation claims, I previously granted the defendants' Motion to Dismiss. *Icenhour v. Town of Abingdon,* No. 1:19CV00033, 2020 WL 534055 (W.D. Va. Feb. 3, 2020). The plaintiff has now filed a Motion for Leave to File Amended Complaint, which the defendants oppose. For the reasons that follow, the motion will be granted in part and denied in part.

I.

Plaintiff Deborah Coffey Icenhour asserts federal statutory claims against her former employer, the Town of Abingdon, Virginia ("Town"), and two state-law defamation claims against a Town Council member, Cindy Patterson, and the Town. Icenhour was hired by the Town as Assistant Town Attorney on October 8, 2007, and was appointed as Town Attorney on January 5, 2009. As Town Attorney, Icenhour also served as the Town's Freedom of Information Act ("FOIA") Officer. She suffers from anxiety, depression, and metalosis. These disabilities affect her daily life activities of ambulating, working, standing, sitting, speaking, and concentrating.

The allegations of the original Complaint are summarized in my earlier opinion. 2020 WL 534055, at *1–3. To those allegations, the proposed First Amended Complaint adds the following factual averments, which I must accept as true at this stage of the proceedings.[1]

Cindy Patterson and Wayne Craig became members of the Town Council, to whom Icenhour reported, in July 2016. Patterson and Craig publicly identified with a group called the Friends of Abingdon ("FOA"), which opposed a planned major commercial development known as the Meadows. Icenhour alleges that

---

[1]  These factual allegations have yet to be proved by the plaintiff and of course I make no prediction as to whether the plaintiff can ultimately prevail.

after Patterson and Craig joined the Town Council, the working environment within the Town became increasingly politicized and hostile, causing a number of employees to resign.

Icenhour asserts that former Town Council member Rick Humphreys on several occasions made phone calls to Icenhour, former Town Manager Gregory Kelly, and former Town Clerk Cecile Rosenbaum, "late at night or during early morning hours in a drunken rage."  First Am. Compl. ¶ 19,  ECF No. 15-1. Humphreys belligerently stated that "if Mr. Kelly did not do things that he wanted done, he would intentionally make Mr. Kelly's, Ms. Icenhour's, and Ms. Rosenbaum's lives miserable."  *Id.*  Humphreys often appeared intoxicated and used profanity toward Town employees.  "Due to stress and anxiety at the workplace, Ms. Icenhour required prescribed medication."  *Id.* at ¶ 20.

Icenhour asserts that Patterson "displayed a pattern of ill-will" towards her. *Id.* at ¶ 23.  Patterson maintained a spiral-bound notebook, pages from which were anonymously sent to Icenhour in 2017.  The pages included a note that "the Town should 'get rid of'" Icenhour and Kelly.  *Id.*

In 2017, Patterson approached Icenhour "in a very hostile and agitated manner" and "demanded that Ms. Icenhour hand her a document that did not exist."  *Id.* at ¶ 24.  Patterson shouted at Icenhour loudly enough that many other employees in the office could hear.

Patterson "was resistant to most of Icenhour's ideas and methodologies of carrying out her job duties," *id.* at ¶ 25, and "criticized Ms. Icenhour's work performance openly at meetings in terms that could only be described as angered shouts," *id.* at ¶ 26.  Icenhour alleges that she was "terrified" of Patterson because it was clear that Patterson disliked her, and Patterson had been charged with domestic abuse but had "openly refused to relinquish her firearm, despite Virginia law commanding the same."  *Id.* at ¶ 27.

On one occasion, Patterson wanted Icenhour and other Town Council members to remove the signature of a particular citizen from a public petition. Icenhour told Patterson that removing the signature was not allowed under the Virginia Freedom of Information Act.  "Ms. Patterson became irate and screamed at Ms. Icenhour."  *Id.* at ¶ 28.  A majority of the Town Council voted to remove the citizen's signature from the petition although the Executive Director of the Virginia FOIA Council had advised against it, which left Icenhour feeling humiliated and embarrassed.

Town employees on various occasions approached Icenhour after Town Council meetings "to express shock, remorse, and sympathy for Ms. Icenhour's harassment and the abuse she suffered from Town leadership, especially Ms. Patterson, during the meeting[.]"  *Id.* at ¶ 30.  These employees included the public works engineer, assistant engineer, engineering technician staff, town planner,

members of the police department, building inspectors, and members of the fire department.

Before a Town Council meeting on September 5, 2017, Patterson spoke with a reporter from a local newspaper about an idea to form a citizen board regarding FOIA requests.  During the meeting, she stated, "'There have been more FOIA requests in recent years because the citizens don't trust the Town; they don't trust the FOIA officer [Ms. Icenhour].  That's obvious.'"  *Id.* at ¶ 32.  According to Icenhour, "Ms. Patterson, through her contacts with FOA, knew, or should have known, that the increase in FOIA requests was due to FOA and its objections to the Town development decisions."  *Id.* at ¶ 34.  Icenhour alleges that Patterson's statement undermined Icenhour professionally and did not represent the views of the Town citizenry as a whole.  According to Icenhour, Patterson's statement "insinuated that Ms. Icenhour either failed to perform some action necessary to fulfill her duties according to the law or acted affirmatively to violate the law."  *Id.* at ¶ 36.  The statement was published in a local newspaper, both in print and online, and the article identified Icenhour as the FOIA officer.  "[A]t no time did the Council indicate that this issue might be advanced as a legislative development."  *Id.* at ¶ 39.

In the early fall of 2016, Craig stated during a public works meeting that

Icenhour was "'in bed with Food City.'"[2]  *Id.* at 49.  Icenhour contends, as she did in her original Complaint, that this statement is defamatory per se because it imputes to her "an unfitness to perform the duties of her employment and/or sexual promiscuity."  *Id.* at ¶ 51.

Icenhour alleges that after Patterson and Craig made these statements, she was subjected to increasingly hostile behavior that eventually led to her constructive discharge.  She asserts that

> former Mayor Cathy Lowe and Ms. Patterson would make remarks to others with the intention that these individuals would share the messages with Ms. Icenhour and would state that Ms. Icenhour needed "to get on board" with their agendas or she would be terminated.  Ms. Lowe stated that if she was not re-elected or "if you do not support me," Ms. Icenhour, Ms. Rosenbaum, and Mr. Kelly would lose their jobs.  Ms. Lowe claimed in an email to Human Resources that she possessed a document that would ensure the termination of all three employees.

*Id.* at ¶ 63.  Lowe also allegedly told Icenhour that when Icenhour gave the Town legal advice that was "not necessarily in Ms. Lowe's personal interest," then "'it would not go well for you.'"  *Id.* at ¶ 64.

On May 3, 2018, while Icenhour was on medical leave pursuant to the Family Medical Leave Act, Patterson and Craig "placed negative, and untrue, evaluations and/or list of complaints into Ms. Icenhour's personnel file."  *Id.* at ¶ 66.  They allegedly intended that the statements would be made public or used to

---

[2]   Food City is the brand name for a grocery store chain affiliated with the Meadows development that FOA opposed.

justify an adverse action against Icenhour.  Icenhour contends that this conduct violated her due process rights by depriving her of a liberty interest without giving her the opportunity to clear her reputation at a hearing.

Icenhour alleges that her disabilities — anxiety, depression, and metalosis[3] — have been exacerbated by the actions of Town Council members, her supervisors.  "Due to the stressful work environment caused by lack of order, discipline, and reliability as well as the political in-fighting among Council members, Ms. Icenhour's disabilities have been negatively impacted and have affected her daily life activities, her health and quality of life."  *Id.* at ¶ 72.  She alleges that the Town's actions against her increased after she filed charges of sex-based and disability-based discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").

Upon her doctor's advice to seek accommodations for her disabilities, Icenhour directed her lawyer to send a letter to the Town on January 10, 2018, purporting to seek reasonable accommodations.  The letter was sent on behalf of Icenhour, Kelly, and Rosenbaum and made the same collective requests on behalf of all three individuals.  The letter did not identify any particular disabilities or tie the requests to limitations associated with disabilities.  The letter states that the

---

[3] The First Amended Complaint describes metalosis as "a toxic blood condition in which exorbitant levels of metals (cobalt and chromium usually originating from an orthopaedic prosthesis) enter the bloodstream and deprive muscle and bone tissue of oxygen, thereby causing the same to deteriorate."  *Id.* at ¶ 70.

"overall aim of these requests is to foster a well-running office, based on the principles of mutual respect, clear communication, and having well-defined roles within the organization." *Id*. at Ex. C. at 1, ECF No. 15-4. The letter sets forth the following requests:

1. The Town Charter is a fundamental document that outlines the Council/Manager form of governance. The Charter is the bedrock upon which the Town exists today. Numerous negative issues have resulted among the parties because an individual did not understand their role as defined in the Charter. It is therefore essential that all Town Council members and Town Management have a nuanced understanding of the Charter. This is a Request that all Members of the Town Council and Town Management shall have a fundamental understanding of the Town Charter.

2. The Town Council adopted a Code of Ethics. This is a Request that the Town Council and Town Management have a fundamental understanding of the Code of Ethics and that all parties continually work toward operating in total compliance with the Code of Ethics on a day-to-day basis.

3. This is a Request that the Town Council acknowledge that it is inappropriate for members of Town Council to give directives to subordinate employees of Town Management. If the Town Council wishes to discuss modification of a Town employee's duties, or have any criticism regarding that employee's actions, omissions, or job duties, then the appropriate course of action would be for the member to address the issue with the appropriate supervisory employee of Town Management.

4. This is a Request for members of Town Council to cease threatening the termination [of] a Town employee's job on a weekly, sometimes daily basis. It is understood that in the course of management, certain situations do indeed warrant the threat of termination. However, a workplace in which staff are threatened with termination many times in a six-month period is an untenable working environment.

5. This is a Request that the Town Council give greater consideration to diversity in hiring Town personnel with an emphasis on the hiring of women in management positions.

6. This is a Request that the Town Council recognize that it is the role of the Mayor to act as liaison between Town Council and Town Management.

7. For an unknown reason, members of Town Council have consistently second-guessed a vast majority of information provided to them by Town Management.  Trust appears to be an issue. Town Management works faithfully on behalf of the Town and members of Town Council. This is a Request that members of Town Council begin working together with Town Management on establishing trust between the parties.

8. This is a Request that every member of Town Council utilize courtesy and care in all communications with Town Management. Consider tone of voice and word choice.

9. This is a Request that all Town staff be treated equally in the eyes of the members of Town Council.

10. This is a Request that Town Council be mindful of the bounds of individual employees' roles within the Town structure. Staff members have consistently been directed by members of the Town Council to perform functions outside the scope of their employment. Should further direction be needed on this issue, this is a Request for written polices or job descriptions to clarify roles, duties and responsibilities.

11. This is a Request that the Town Council acknowledge that this is a team. It is within the best interest of the Town for Town Council to support and defend Town Management, not fight Town Management.

12. This is a Request that should a dearth of written policies effectuating the above requests not exist at the time these requests were submitted, that Town Council, working with Town

> Management, work in conjunction to draft written standing policies
> that provide guidance to all individuals.

*Id.* at 2–3.  Approximately three months later, counsel representing the Town sent

Icenhour a letter in response saying that the Town would engage in an interactive

process with her.  When Icenhour then attempted to communicate with the Town,

she received no further reply.

Icenhour alleges that the Town's failure to engage in an interactive process

with her resulted in a failure to identify an appropriate accommodation.  She

asserts that her requests were reasonable because they "required little effort or

money to implement" and "would permit her to more quickly complete the

essential functions of her job, such as responding to Town stakeholders and

rendering opinions, and not affect her non-working hours."  First Am. Compl.  ¶

77, ECF No. 15-1.

Icenhour avers that she disclosed her disabilities to Lowe, Humphreys, and

Craig and told them that her conditions were exacerbated by workplace stress.  She

alleges that it became well-known throughout Town Hall that Icenhour had filed

charges of discrimination with the EEOC.  She "believed that the Town leaders'

attacks on her became more severe and pervasive due to her disclosures of her

disabilities and because of her EEOC filings.  In particular, Ms. Patterson became

even more aggressive towards Ms. Icenhour and the Town moved to strip Ms.

Icenhour's job duties."  *Id.* at ¶ 81.

Following her EEOC filings, the Town Council appointed a male employee, Floyd Bailey, to be an additional FOIA Officer for the Town, a position that Icenhour had held for a decade. According to Icenhour, Bailey essentially replaced her. The Town Council approved a pay increase for Bailey when he assumed FOIA Officer duties, but Icenhour had never received any additional pay for her work as FOIA Officer. Icenhour was required to train Bailey because he had no prior knowledge or experience regarding FOIA.

Icenhour alleges that on December 21, 2017, approximately 10 days after she filed an EEOC charge, Icenhour invoked an extended seven-day response window to a FOIA request made by Craig, and Craig responded by sending her a threatening email. In the email, Craig stated that if Icenhour did not respond by his deadline, he would "'be in touch with [his] attorney and we will get this straightened out in another way.'" *Id.* at ¶ 109.

In July 2018, "the Town's human resources director stated that she was forbidden to meet with Ms. Icenhour without her attorney or a witness present." *Id.* at ¶ 111. Icenhour was denied a pay raise when other Town Council-appointed personnel were granted pay raises.

In late February 2017, seeing Icenhour limping, Craig asked her, "'how is your estrogen level?'" *Id.* at ¶ 137. In early Fall 2016, Craig stated during a public meeting that Icenhour was "'in bed with Food City,'" which Icenhour asserts was

referring to a political stance "in terms of a sexualized metaphor, i.e., being intimate with another party in bed." *Id.* at ¶ 138.

Icenhour's proposed First Amended Complaint continues to assert the following claims:   defamation, against Patterson and the Town (Count I); defamation per se, against Patterson and the Town (Count II); deprivation of liberty interest in violation of 42 U.S.C. § 1983, against the Town (Count III); disability-based discrimination in violation of the ADA, against the Town (Count IV); retaliation in violation of the ADA, against the Town (Count V); failure to accommodate in violation of the ADA, against the Town (Count VI); and sex discrimination and sex-based wage discrimination in violation of Title VII, against the Town (Count VII).   The Town argues that the new allegations remain insufficient to state viable claims for relief.

## II.

Federal Rule of Civil Procedure 15 provides that in order to amend her Complaint at this juncture, Icenhour must obtain either the defendants' consent or leave of court.  The court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Nevertheless, "a district court has discretion to deny a motion to amend a complaint, so long as the court does not 'outright refus[e] to grant the leave without any justifying reason.'"  *Howard v. Lakeshore Equip. Co.*, 482 F. App'x 809, 811 (4th Cir. 2012) (unpublished) (quoting *Foman v. Davis*, 371 U.S.

178, 182 (1962)).  Denial of leave to amend is appropriate "when the amendment would be prejudicial to the opposing party," when the plaintiff has acted in bad faith, or when the amendment would be futile.  *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc) (internal quotation marks and citations omitted).  "A proposed amendment is futile when it is clearly insufficient or frivolous on its face," or "if the claim it presents would not survive a motion to dismiss."  *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 228 (4th Cir. 2019) (internal quotation marks and citations omitted).

### A. Defamation Claims (Counts I and II).

Under Virginia law, "[i]n order to assert a claim of defamation, the plaintiff must first show that a defendant has published a false factual statement that concerns and harms the plaintiff or the plaintiff's reputation."  *Lewis v. Kei*, 708 S.E.2d 884, 891 (Va. 2011).  "The plaintiff also must show that the defendant knew that the statement was false, or, believing that the statement was true, lacked a reasonable basis for such belief, or acted negligently in failing to determine the facts on which the publication was based."  *Id.*  "When a plaintiff asserts that the defendant acted negligently, the plaintiff must further prove that the defamatory statement made apparent a substantial danger to the plaintiff's reputation."  *Id.*

> At common law, defamatory words that prejudice a person in his or her profession or trade are actionable as defamation *per se*.  A defamatory statement may be made by inference, implication or insinuation.  However . . . speech which does not contain a provably

> false factual connotation, or statements which cannot reasonably be
> interpreted as stating actual facts about a person cannot form the basis
> of a common law defamation action.

*Fuste v. Riverside Healthcare Ass'n, Inc.*, 575 S.E.2d 858, 861 (Va. 2003) (internal

quotation marks, citations, and alterations omitted).   In deciding whether a

statement is defamatory, I must "consider not only the words themselves but also

the inferences fairly attributable to them."   *Hatfill v. N.Y. Times Co.*, 416 F.3d 320,

331 (4th Cir. 2005) (internal quotation marks and citation omitted).

Statements of opinion cannot form the basis of a defamation claim.   *Lewis*,

708 S.E.2d at 891.   The court determines as a matter of law whether a statement is

one of fact or opinion.   *Id.*   "[T]he court must evaluate all of the statements

attributed to the defendant and determine whether, taken as a whole, a jury could

find that defendant knew or should have known that the factual elements of the

statements were false and defamatory."   *Id.*   The question is not whether the

statement is true or false, "but whether it is capable of being proved true or false."

*Tharpe v. Saunders*, 737 S.E.2d 890, 893 (Va. 2013).   "When a speaker plainly

expresses a subjective view, an interpretation, a theory, conjecture or surmise,

rather than a claim to be in possession of objectively verifiable false facts, the

statement is not actionable."   *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186

(4th Cir. 1998) (internal quotation marks, citation, and alterations omitted).

I previously held that Icenhour had failed to state viable claims of defamation or defamation per se because Patterson's statement, on which the claims are based, was a statement of opinion not capable of being proved true or false.  2020 WL 534055, at *6.  In her proposed First Amended Complaint, Patterson rests her defamation claims on the same statement by Patterson:  "'There have been more FOIA requests in recent years because the citizens don't trust the Town; they don't trust the FOIA Officer [Ms. Icenhour].  That's obvious.'"  First Am. Compl. ¶ 32, ECF No. 15-1.  Patterson now also alleges that "Ms. Patterson, through her contacts with FOA, knew, or should have known, that the increase in FOIA requests was due to FOA and its objections to the Town development decisions."  *Id.* at ¶ 34.

This new allegation is insufficient to render Patterson's statement one of fact rather than opinion.  As I stated in my earlier opinion,

> It is clear from Patterson's statement that she was simply giving her opinion of the reason for the increase, based not on any quantifiable data regarding the motivations of Town citizens, but solely on her own conjecture. This statement is not capable of being proved true or false. The Town of Abingdon has thousands of residents, and it would be practically impossible to interview all of them and determine whether they did or did not trust Icenhour as the Town's FOIA officer. No reasonable person hearing Patterson's statement would have thought that she made the statement based on anything other than her own opinion and perhaps a few anecdotal conversations with an unrepresentative sample of Town citizens.

2020 WL 534055, at *6; *see Carey v. Throwe,* 957 F.3d 468 (4th Cir. 2020) ("[The] remark . . . is the stuff of everyday life in a free society, and which may not support a defamation claim. . . . [T]he opinion does not contain any assertion of objective fact; it would strain even the most creative mind to figure how it could be proven true or false."). I find that as to Counts I and II, the proposed amendment would be futile, as these claims as amended would not survive a motion to dismiss. I will therefore deny the motion to amend as to the defamation claims.

### B.  *Deprivation of Liberty Interest (Count III).*

For an employee to successfully show that her public employer violated her liberty interests by making a false statement about her, she must show that her employer made statements that "(1) placed a stigma on [her] reputation; (2) were made public by the employer; (3) were made in conjunction with [her] termination or demotion; and (4) were false." *Sciolino v. City of Newport News,* 480 F.3d 642, 646 (4th Cir. 2007).

I previously held,

> To the extent Count III is based on Patterson's statement that Town citizens did not trust the FOIA officer, the claim fails because the statement is neither provably false nor sufficiently stigmatizing. The statement does not indicate why citizens might not have trusted Icenhour, nor does it imply that she had done anything immoral to warrant such distrust. Moreover, Icenhour alleges that Patterson made her statement on September 5, 2017, but her employment did not terminate until July 14, 2018, more than ten months later. The Complaint contains insufficient factual allegations to tie the

September 5, 2017, statement to Icenhour's later alleged constructive discharge.

To the extent Count III is based on Craig's alleged fall 2016 statement that Icenhour was "in bed with Food City," this statement is even more remote in time from Icenhour's alleged constructive discharge, having occurred approximately a year and ten months earlier. Again, the Complaint alleges insufficient facts to tie this apparently stray comment by an individual Town Council member to Icenhour's much later termination of employment. As to Craig's statement, Icenhour fails to satisfy the third element set forth in *Sciolino*.

2020 WL 534055, at *7. Those rulings apply with equal force to the proposed First Amended Complaint, which alleges no new facts to save Icenhour's deprivation of liberty interest claim as to the referenced statements by Patterson and Craig.

Icenhour now additionally alleges that Patterson and Craig "placed negative, and untrue, evaluations and/or list of complaints into Ms. Icenhour's personnel file," First Am. Compl. ¶ 66, ECF No. 15-1, with the intention that the statements would be made public or used to justify an adverse action against Icenhour. This allegation does not indicate that the evaluations or complaints actually *were* made public. Moreover, the proposed amendment does not reveal the substance of the evaluations or complaints and thus does not adequately plead that they were sufficiently stigmatizing. This new allegation therefore fails to state a viable claim of deprivation of liberty interest.

In granting the defendants' Motion to Dismiss this claim, I also found,

> Icenhour has not alleged that she took advantage of the available grievance procedure, requested a hearing either before or after her employment terminated, or that she was denied a hearing. *See Owen v. City of Indep.*, 445 U.S. 622, 661 (1980) ("Due process requires a hearing on the discharge of a government employee if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination.") (internal quotation marks, citation and alterations omitted); *Bd. of Regents of State Colls.*, 408 U.S. at 569 (explaining that when a constitutional liberty interest is implicated, a hearing is required).

2020 WL 534055 at *7. That remains true of the proposed First Amended Complaint. Because Icenhour has not alleged any new facts that would cure this deficiency, I conclude that the proposed amended Count III would not survive a motion to dismiss, and the proposed amendment is therefore futile as to that Count.

### C. Disability Discrimination (Count IV).

The ADA protects qualified individuals with disabilities from discrimination on the basis of their disabilities. 42 U.S.C. § 12112(a); *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 278–79 (4th Cir. 2004). A qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

> In an ADA wrongful discharge case, a plaintiff establishes a *prima facie* case if he demonstrates that (1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

*Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001).

In this case, Icenhour claims that she was constructively discharged. "The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016) (internal quotation marks and citation omitted). In such a situation, the law will treat the employee's resignation as a discharge. *Id.*

"In assessing intolerability, the frequency of the conditions at issue is important." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019). "[W]hen the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." *Id.* "Further, difficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to resign." *Id.* The question is not whether resigning was the plaintiff's wisest or best choice under the circumstances, but rather whether a reasonable person in the plaintiff's position "would have had *no choice* but to resign." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 212 (4th Cir. 2019) (internal quotation marks and citation omitted). This standard is higher than the severity or pervasiveness required to prove a hostile environment harassment claim. *Id.*

At this early stage of the proceedings, I conclude that the new allegations, if true, could amount to sufficiently intolerable working conditions to support a constructive discharge theory. Count IV still fails to state a viable claim, however, because the new allegations do not raise a reasonable inference of disability-based discrimination. While if proved true — and I consider them now only for the purposes of the present motion — the alleged actions and statements by Patterson, Craig, Lowe, and Humphreys are regrettable, the First Amended Complaint suggests that they were driven by political and personal motivations unrelated to Icenhour's disabilities, such as opposition to the Meadows development and a desire to be reelected. There are no allegations tying any of the Council Members' statements or actions to Icenhour's disabilities. The new allegations simply do not give rise to an inference that the Town treated Icenhour less favorably than others on account of her anxiety, depression, or metalosis.

Because Icenhour's claim of disability discrimination would not survive a motion to dismiss, I conclude that amendment would be futile as to Count IV. I will therefore deny the motion to amend as to that count.

### D. ADA Retaliation (Count V).

To establish a claim of retaliation under the ADA, a plaintiff must show that "(1) [she] engaged in protected conduct, (2) [she] suffered an adverse action, and

(3) a causal link exists between the protected conduct and the adverse action." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012).

Filing a charge of discrimination with the EEOC is protected conduct under the ADA.  Icenhour has now alleged sufficient facts to render her constructive discharge theory plausible and has thus pled that she suffered an adverse action.  In addition, I find that she has stated facts which, if true, could demonstrate a causal link between her filing of EEOC charges and her asserted constructive discharge. She alleges that the Town's behavior toward her worsened after she filed her EEOC charges.  The dates of several of the acts of which she complains place them after but in close proximity to when she filed her charges.  I find that this is enough to allow Icenhour to explore this claim in discovery.  I will grant the motion to amend as to Count V.

### E.  Failure to Accommodate (Count VI).

The ADA requires an employer to "make reasonable accommodations for an applicant or an employee's disability."  *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 371 (4th Cir. 2008).  The applicable regulation provides:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3).  To state a claim for failure to accommodate, a plaintiff must plausibly allege "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (internal quotation marks, alterations, and citations omitted).

Icenhour hinges her failure to accommodate claim on the requests contained in the January 10, 2018, letter from her attorney to the Town, asserting that her requests were reasonable because they "required little effort or money to implement" and "would permit her to more quickly complete the essential functions of her job, such as responding to Town stakeholders and rendering opinions, and not affect her non-working hours."  First Am. Compl. ¶ 77, ECF No. 15-1.  But the requests in the letter are not tied to limitations caused by any particular disabilities and are not even specific to Icenhour.  Rather, the requests appear to address general workplace grievances.

Icenhour has not alleged any facts to suggest that she and the Town could have arrived at reasonable accommodations for her disabilities had they engaged in an interactive process.  She merely states in a conclusory fashion that the "Town's refusal to engage in the interactive process resulted in the failure to identify an

-22-

appropriate accommodation." *Id.* at ¶ 76.  She alleges that she "requested a myriad of possible and reasonable accommodations," *id.* at ¶ 93, but she does not identify any of them beyond those listed in the January 10, 2018, letter.

As to Count VI, I find that the new allegations are insufficient to state a claim on which relief can be granted.  I will therefore deny the motion to amend with respect to the failure to accommodate claim.

### F.  Sex Discrimination (Count VII).

Title VII prohibits an employer from discriminating against an employee because of sex, including with respect to compensation.  42 U.S.C. § 2000e-2(a)(1).  Title VII requires establishing intentional discrimination through one of two mechanisms.  A plaintiff can either produce direct or circumstantial evidence of discrimination or utilize the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "to develop an inferential case of discriminatory intent." *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019) (internal quotation marks and citation omitted).  Under *McDonnell Douglas*, to establish a prima facie case of gender-based wage discrimination, a plaintiff must show: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) circumstances that suggest an unlawfully discriminatory motive. *Spencer*, 919 F.3d at 207.  When a plaintiff

bases her claim of wage discrimination on comparators, she "must show that she is paid less than men in similar jobs." *Id.*

In the context of employment discrimination claims, "a plaintiff is not required to plead facts that constitute a prima facie case" in order to survive a motion to dismiss. *Coleman v. Md. Ct. of App.*, 626 F.3d 187, 190 (4th Cir. 2010) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–15 (2002)). Nevertheless, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Coleman*, 626 F.3d at 190 (quoting Bell Atl. Corp. v. *Twombly*, 550 U.S. 544, 555 (2007)).

The proposed First Amended Complaint adds no consequential factual averments with respect to Icenhour's Title VII claim. In granting the Town's Motion to Dismiss as to this claim, I found:

> Icenhour has not alleged any facts from which I could infer that she was similarly situated to Bailey. She has not even alleged that he was paid more than her. She does not tie Craig's alleged statements to her rate of pay. Indeed, Craig joined Town Council many years after Icenhour first became the Town's FOIA Officer, so there is no indication that he played any role in setting her compensation. Two stray comments, remote in time, from a single Town Council member, do not comprise circumstances suggesting unlawful sex-based pay discrimination.

2020 WL 534055 at *11. In her proposed amendment, Icenhour has not stated any additional facts to cure these defects. The proposed First Amended Complaint does not show circumstances that suggest unlawful sex-based wage discrimination.

I thus conclude that amendment would be futile as to Count VII, and I will deny the motion to amend as to that count.

III.

For the foregoing reasons, the Motion for Leave to File Amended Complaint, ECF No. 15, is GRANTED IN PART and DENIED IN PART.  The motion is DENIED as to Counts I (defamation), II (defamation per se), III (deprivation of liberty interest), IV (disability discrimination), VI (failure to accommodate), and VII (sex discrimination).  The motion is GRANTED as to Count V (ADA retaliation).  The case will proceed hereafter only as to Count V. The Clerk shall refile the First Amended Complaint now filed at ECF No. 15-1. The defendant shall respond in accord with the Federal Rules of Civil Procedure.

It is so **ORDERED**.

ENTER:  May 20, 2020

/s/  JAMES P. JONES
United States District Judge