## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **DEBORAH COFFEY ICENHOUR,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:19CV00033 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **THE TOWN OF ABINGDON,** | ) | JUDGE JAMES P. JONES |
| **ET AL.,** | ) | |
| | ) | |
| Defendants. | ) | |

*Monica L. Mroz,* STRELKA EMPLOYMENT LAW, *Roanoke, Virginia, for Plaintiff; Cameron S. Bell and Ramesh Murthy,* PENN, STUART & ESKRIDGE, *Abingdon, Virginia, for Defendant Town of Abingdon, Virginia.*

In this employment-related civil case asserting a claim of retaliation under the Americans with Disabilities Act ("ADA"), the defendant has moved for summary judgment. For the reasons that follow, I will grant the motion.

I.

A.

Plaintiff Deborah Coffey Icenhour initially asserted eight claims in the case. Compl., ECF No. 1. I dismissed all eight, which included two state law defamation claims, a claim for deprivation of liberty interest under 42 U.S.C. § 1983 based on an alleged stigma to her reputation, three claims under the ADA (disability discrimination, retaliation, and failure to accommodate), a claim of sex-

based discrimination under Title VII, and a claim of sex-based wage discrimination under the Equal Pay Act. *Icenhour v. Town of Abingdon*, No. 1:19CV00033, 2020 WL 534055, at *12 (W.D. Va. Feb. 3, 2020). Icenhour then moved to amend her complaint. I denied leave to amend with respect to all but the ADA retaliation claim. I held that Icenhour's Amended Complaint alleged sufficient facts to state a plausible claim of retaliation under the ADA. *Icenhour v. Town of Abingdon*, No. 1:19CV00033, 2020 WL 2553201, at *9, 10 (W.D. Va. May 20, 2020). After the close of discovery, the Town of Abingdon, the only remaining defendant, has moved for summary judgment. The motion has been fully briefed and orally argued.

B.

The following facts are taken from the summary judgment record and, where disputed, are stated in the light most favorable to the plaintiff as nonmovant.

Icenhour began her career with the Town of Abingdon as Assistant Town Attorney and then served as Town Attorney from January 2009 until July 2018. As Town Attorney, Icenhour was appointed by and reported to Town Council. From the beginning of her employment, her duties included responding to requests pursuant to the Virginia Freedom of Information Act ("FOIA"). She was officially appointed the Town's FOIA officer in 2016 due to a change in state law that required all municipalities to have a designated FOIA officer.

Beginning in 2014 or 2015, local controversy arose regarding a proposed commercial development known as the Meadows.   In 2016, two new Town Council members were elected — M. Cindy Patterson and J. Wayne Craig. Patterson and Craig were both members of a group called Friends of Abingdon ("FOA"), which was formed to oppose the Meadows project.   Patterson ran on an open-government and anti-development platform.   Craig publicly objected to aspects of how the Meadows project had been handled.   They joined Council members Cathy Lowe, Richard Humphreys, and Robert Howard to comprise the Town Council from July 1, 2016, through June 30, 2018.

During the 2016 election season and thereafter, the Town was politicized and divided.   It was a tense employment environment.   There was in-fighting among Council members, and many employees felt inordinate stress.   Icenhour testified that the root of the conflict was the Meadows project, and everyone working for the Town felt the effects of it.   Pl.'s Br. Opp'n Mot. Summ. J. Ex. 1, Icenhour Dep. 35–36, ECF No. 71-1.

Council members' conduct reduced members of the staff to tears at one point or another.   Humphreys frequently used profanity in his communications with appointees and employees.   Human Resources Director Stacy Reichler received complaints from employees about his behavior.   Craig called various people "'assholes.'"   *Id*. at Ex. 4, Kelly Dep. 195–96, ECF No. 71-4.   Craig made a

joke to Town Manager Gregory Kelly about a sexual harassment matter.  *Id.* at 66.
From 2016 to 2018, five key Town employees resigned.

In August 2016, Craig stated at a public meeting that Icenhour was "in bed
with Food City," the grocery store chain that was the principal sponsor of the
Meadows project.  Icenhour Dep. 118, 141–43, ECF No. 71-1.  Icenhour felt
maligned and humiliated.  She began taking anxiety medication.

Before Patterson was elected to Town Council, she had publicly stated that
the Meadows development would negatively impact her business, a bed and
breakfast near the Meadows site.  After she was elected, some citizens expressed
concern that she had a conflict of interest.  In July 2016, Icenhour asked the local
Commonwealth's Attorney, Joshua Cumbow, to determine whether a conflict
existed.  Cumbow opined that Patterson did not have a conflict, and Icenhour took
no further action.  In the summer of 2017, Patterson learned of the inquiry and was
irate.  She brought her private attorney with her to Icenhour's office and demanded
to see a copy of the letter Icenhour had written to Cumbow.  No such letter existed,
since Icenhour had made a verbal request to Cumbow.  Patterson was disheveled,
red-faced, and behaved angrily, and Icenhour felt threatened.

Icenhour suffers from anxiety, depression, and metalosis.  In 2016, she
began experiencing complications from a hip replacement she had undergone the
year before.  She was in great pain, walked with a limp, had difficulty climbing

stairs and standing for extended periods of time, and fell several times at work. She had a handicapped parking tag for her car and regularly parked in a handicapped parking spot.   From 2016 to 2018, she had frequent doctors' appointments and medical procedures that required her to take time off work.   In February 2017, Craig asked her if she needed to have her estrogen level checked since she was sick so much.

On one occasion, Humphreys required Icenhour to stand and read an entire proposed zoning ordinance amendment, which was quite lengthy.   Humphreys knew that Icenhour was in pain, and there was no legitimate reason to have her read the amendment aloud, as it had been made available in writing in advance of the meeting.   Reading the amendment took about 30 minutes and caused Icenhour excruciating pain.   She had to grip the podium for support.   She could not recall when this incident occurred.

One day while Icenhour was at home on medical leave, Lowe came to her house unannounced to confirm whether she was actually sick.   This incident was either in the fall of 2016 or the fall of 2017; Icenhour could not remember the date. Former Town Manager Gregory Kelly, who has also sued the Town, testified that "Miss Patterson was continually looking into information about [Icenhour's] condition and why she was out on [medical leave]."   Kelly Dep. 162, ECF No. 71-4.

Icenhour and Kelly attempted to educate Patterson and Craig on local government practices, FOIA law, council relations, and ethics, arranging for trainings and buying books for them, but Patterson and Craig were not interested in the information being provided. Patterson refused to sign the Code of Ethics that Council had adopted in 2010. Other Council members did not believe that the Code of Ethics applied to them.

In late 2015 or early 2016, the number of FOIA requests submitted to the Town increased significantly, with most of the requests coming from FOA or its members. When Patterson and Craig joined Council, they criticized Icenhour's handling of FOIA requests. They thought she was too restrictive in her determinations of what was disclosed. On September 5, 2017, Patterson publicly commented that the people of Abingdon did not trust the FOIA officer, Icenhour. The statement was printed in a local newspaper.

When Patterson's own handwritten notes were the subject of a FOIA request, she provided them after the deadline and angrily, throwing them down on a chair as a number of them landed on the floor. Patterson complained that the papers were insufficiently redacted. This was the only FOIA request for which Icenhour provided an untimely response, due to Patterson's delay. Nevertheless, Patterson made the unfounded assertion that Icenhour was incompetent as the FOIA officer.

Humphreys frequently called and texted Icenhour in the middle of the night to complain about trains blowing their horns, often using profanity.  Icenhour explained that there was legally nothing she could do about the issue, as trains are governed by federal regulations and are required to blow their horns to alert people of potential danger.  To appease Humphreys, Icenhour called the railroad to remind them about the Town's no-blow ordinance.  Humphreys remained irate and continued to harass her about the noise.  Humphreys owned an inn near the railroad tracks and was concerned about the impact that the train whistles would have on his guests and his business.

In early 2017, Lowe ordered Icenhour to post an FOA petition online.  One of the signatories later asked that it be taken down and his signature redacted.  Icenhour conducted research and determined that the signature could not be removed after the fact.  Dissatisfied with her explanation, the signer showed up at a March 2017 work session meeting and demanded that the petition be taken down.  Patterson disregarded Icenhour's advice and verbally attacked her in front of the crowd.  Lowe publicly commented that she did not know how the petition came to be posted online, despite having directed Icenhour to post it.  Council then voted to take the petition down.  This incident made Icenhour feel unsupported and as though the Town Council believed it could do as it pleased regardless of what the Town Attorney said.

Council's behavior caused Icenhour to suffer from anxiety, depression, high blood pressure, headaches, sleeplessness, shortness of breath, weakness, and shakiness.  She told Lowe in a text message that she was seeing a doctor and her anxiety was worsening.  Council members were aware of Icenhour's health issues.  Lowe testified in her deposition that "Deb complained all of the time, so it got, you know, redundant."  *Id.* at Ex. 3, Lowe Dep 207, ECF No. 71-3.

Icenhour filed three EEOC charges against the Town asserting discrimination on the basis of disability and sex as well as retaliation.  She filed her first charge on September 7, 2017.  She alleged, in relevant part:

> Ms. Icenhour suffers a disability, to-wit, anxiety and depression. These conditions have been exacerbated due to the often unprofessional and occasionally outrageous actions of several of Ms. Icenhour's supervisors, the Town Council of Abingdon and the Mayor of Abingdon.  Due to political in-fighting among council members, Ms. Icenhour's disabilities have affected daily life activities.  On one occasion in January of 2017, Council member Wayne Craig mocked her condition by commenting that Ms. Icenhour "had problems with estrogen." Ms. Icenhour works day-to-day in a severe and pervasive hostile working environment. Despite performing her job exceptionally well, she has been threatened with termination.  These threats are a pretext masking a discriminatory animus against disabilities. Ms. Icenhour has been subjected to insults, invasions of privacy, disclosure of confidential information, and profane and obscene messages from Town leadership.

> Ms. Icenhour has been threatened and mocked by Abingdon leadership due to her disability and is concerned for her livelihood. Upon information and belief, Abingdon leadership has defamed her to community groups.

Council Member Cindy Patterson has intentionally falsely accused Ms. Icenhour [of] drafting communications regarding Ms. Patterson in an attempt to harass and intimidate Ms. Icenhour. Ms. Patterson has made repeated contact with representatives of the press in an effort to defame Ms. Icenhour. On one occasion in the summer of 2017, Ms. Icenhour needed documents from Ms. Patterson to adequately respond to a FOIA request. Instead of professionally and politely delivering the documents, Ms. Patterson angrily threw the documents in the office. Some of the documents landed on a chair and some on the floor.

On September 6, 2017, Ms. Patterson told media representatives that the Town of Abingdon "did not trust" Ms. Icenhour. This comment was widely publicized and further led to an exacerbation of disability-related symptoms.

Ms. Icenhour has been wrongfully denied merit increases and cost of living salary increases while other employees of Abingdon have regularly received such raises.

As a disabled employee, Ms. Icenhour is protected from disability discrimination by the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 et seq., and the ADA Amendments Act of 2008 (ADA). As Ms. Icenhour's employer, Abingdon has an obligation to maintain a work environment not charged with disability discrimination. However, Abingdon instead permitted a work environment to exist that was discriminatory and offensive to Ms. Icenhour. Upon information and belief, Abingdon discriminated against Ms. Icenhour because of her disability, in violation of the ADA.

Mem. Supp. Mot. Summ. J. Ex. 1, Icenhour Dep. Ex. 3, ECF No. 62-1. A Notice of Suit Rights letter regarding this charge was sent to Icenhour's counsel on December 12, 2017. She did not file suit within 90 days.

Icenhour's second charge is dated December 21, 2017. This charge repeats some of the statements from the first charge and adds the following:

Ms. Icenhour has continued to suffer discrimination due to her disability and retaliation based on her disability and for filing a Charge of Discrimination with the Equal Employment Opportunity Commission . . . .

Ms. Icenhour was informed by the Director of Human Resources for the Town of Abingdon that the Mayor of Abingdon had an in-person meeting with her on October 5, 2017.  The Mayor inquired whether Ms. Icenhour could be terminated and/or not reappointed to her position.  The Mayor expressly stated that her desire was for the "EEOC Charge to go away."  The Mayor also accused Ms. Icenhour of requiring Town Council to sign a document for which the Council was not briefed on the contents.  Such an accusation could lead to negative consequences with the Virginia State Bar.

The Mayor and Vice Mayor continually belittle and isolate Ms. Icenhour.  The Mayor and Vice Mayor confer with Town Manager Greg Kelly about matters within the purview of Ms. Icenhour's job as Town Attorney.  The Mayor accused Ms. Icenhour of refusing to provide information to the Town Council.  However, such accusations are pretextual.

*Id*. at Ex. 5, ECF No. 62-1.  A Notice of Suit Rights letter was sent to Icenhour's counsel on January 29, 2018.  She did not file suit within 90 days.

Icenhour testified that after filing her EEOC charges, she felt like "hunted game" and felt a sense of "impending doom."  Icenhour Dep. 96, ECF No. 71-1.  "I felt like every council member, possibly excepting Bob Howard, was after me for all their own reasons, and it was driving me off the deep end, driving me crazy."  *Id.* at 97.

Council members Lowe, Craig, and Humphreys frequently threatened Icenhour's employment and asked if she had found another job yet.  At least some

of these threats occurred after Icenhour filed her first EEOC charge, although she could not identify any particular dates.  Howard testified that Patterson and Craig frequently behaved disrespectfully and uncivilly.  Howard testified that Patterson raised her voice to Icenhour and was working against her.

In May 2017, members of Council learned that Patterson had been charged with domestic assault and had not relinquished her concealed carry permit and firearm as required by state law.  Council members became concerned about this. Lowe, Humphreys, and Howard signed a letter authorizing Icenhour to seek guidance from the local state circuit court judge about how to handle the situation. Icenhour sought such an opinion and the judge responded by saying the court could take no action because the request had not been served on Patterson.  The judge sent a copy of the letter to Patterson, who became very upset about the request. She responded by calling a press conference.  An FOA member named Kevin Sandenaw later filed a lawsuit about the letter Icenhour had sent to the circuit court, alleging that the Council members and Icenhour had violated FOIA by having a secret meeting.  Icenhour testified that she had shown Lowe, Humphries, and Howard individually the letter she intended to send to the court, but Lowe claims she never saw it and only directed Icenhour to gather information, not to seek an opinion from the court.

After Icenhour filed her first EEOC charge, Lowe publicly disavowed responsibility for the letter to the court. Craig also denied having known about the request, although Humphreys had talked to him about it in advance and he had agreed Council should do something. Icenhour felt that Council members made her the scapegoat when she had acted at their direction.

Just before Christmas in 2017, Craig requested certain documents relating to the Meadows development. In accordance with FOIA guidance and Town practice, Icenhour treated his request as a FOIA request. Because the Town was short-staffed due to the holidays, she invoked her right under FOIA to a seven-day extension to respond. Craig replied by email, saying he did not send a FOIA request and was entitled to the documents as a Council member, and if he did not hear from her by the next day, he would get his lawyer involved. Craig sent this email on the same day that Icenhour signed her second charge of discrimination, although the charge was not received by the EEOC until five days later, and there is no indication that Craig knew about the second EEOC charge when he sent the email.

Icenhour emailed Craig the next day explaining why his request had been treated as a FOIA request and further explaining why additional time was needed to respond. An attorney then sent a letter to Icenhour stating that FOIA was inapplicable to the request and her response to Craig was in clear violation of

Town policy.  The letter concluded, "if you persist in this position, Councilman Craig will take it as deliberate insubordination on your part and plans to raise this issue at the next Town Council meeting."  Pl.'s Br. Opp'n Mot. Summ. J. Ex. 26, ECF No. 71-26.

Icenhour talked to Human Resources Director Stacy Reichler about her treatment by Council members.  She told Reichler that she was expected to be on call all the time.  Reichler advised Icenhour to set expectations and parameters around her communications with Council members, and she told her she was entitled to have a healthy work-life balance.  Reichler did not report Icenhour's complaints to Council.

After Icenhour filed her first EEOC charge, Reichler spoke with Lowe. When Reichler advised Lowe that Icenhour needed to be able to be offline and have some boundaries with Council members, Lowe responded, "That's ridiculous." *Id*. at Ex. 6, Reichler Dep. 54–55, ECF No. 71-6.

Icenhour and other witnesses testified that Council members' behavior worsened after she filed her first EEOC charge.  Ms. Lowe tried to keep her anger in check immediately after the EEOC charges were filed, but her undermining behavior eventually became worse.  Lowe would question legal advice given by Icenhour and then seek legal advice from other attorneys who did not represent the Town.  Council members did nothing to defend Icenhour against repeat public

charges of incompetence in the press and elsewhere.  The record contains few dates or details about these alleged instances.

After Icenhour filed her first and second EEOC charges, no one from the Town sought to engage her in any kind of interactive process to find a reasonable accommodation.  Her attorney sent a letter to the Town Council members instructing them not to discuss her claims with her, but the Council members never contacted Icenhour's attorney about the claims, either directly or through counsel.

In April 2018, Council appointed IT Director Floyd Bailey as an additional FOIA officer.  Icenhour had been inundated with FOIA requests and had been working long hours to timely respond to all the requests.  She was preparing to take an extended medical leave.  She testified, "I could foresee that without having someone else to assist and take responsibility, that the town may fall behind and be in real violation."  Icenhour Dep. 193, ECF No. 71-1.  Bailey received a $5,000 pay raise to compensate him for the additional FOIA-related duties.  He had no background in FOIA, and Icenhour had to train him.  She did not receive a pay raise, either in 2018 or at an earlier time in recognition of her FOIA duties.  Icenhour testified that she was not against having some additional help in responding to FOIA requests and that "having Floyd or someone there to assist [her] was of assistance to [her]."  *Id.*

- 14 -

Evaluations of Council appointees took place in the spring of 2018 while Icenhour was on medical leave.  Patterson testified that she expected Icenhour to attend her review meeting despite being on leave.  *Id*. at Ex. 10, Patterson Dep. 72–73, ECF No. 71-10.  Craig and Patterson individually wrote negative evaluations of Icenhour and gave them to Lowe, who asked Reichler to place them in Icenhour's personnel file.  According to Icenhour and others, the evaluations contained false accusations and referenced incidents that had happened a year or more prior.  Patterson's evaluation of Icenhour essentially faulted her for not defending or advocating for Patterson with respect to the conflict-of-interest issue and the concealed carry permit issue.  Craig's evaluation complained about the letter to the circuit court regarding Patterson and the resulting lawsuit filed by an FOA member; an allegedly flawed retention basin agreement; and alleged failure to renew an unspecified lease agreement.  Icenhour's evaluation in early 2016, prior to Craig and Patterson joining Council, had been positive.  Patterson and Craig directed Reichler to open a safety deposit box and store Icenhour's personnel folder there, along with those of Kelly and Assistant Town Manager Cecille Rosenbaum, instead of storing them at Town Hall.  Reichler testified that this was highly unusual.

Icenhour was reappointed as Town Attorney in 2018.  Craig and Patterson voted to reappoint her.  She did not receive a pay increase for the 2018-19 fiscal

year.   It was the Town Manager's responsibility to propose pay raises for appointees as part of the annual budget proposal process, and the record does not indicate whether the Town Manager or anyone else proposed an increase for Icenhour that year.   There is no evidence that Town Council affirmatively voted to deny her a pay increase.

Three newly elected Council members took office two weeks prior to Icenhour's resignation.   Lowe, Humphreys, and Howard all left Town Council on June 30, 2018; Craig and Patterson remained and became Mayor and Vice Mayor. Icenhour's hip revision surgery was scheduled for June 6, 2018.   She had been on medical leave since April 18, 2018, nearly three months prior to her resignation.

Icenhour's resignation letter, dated July 14, 2018, reads:

> It is with a great deal of distress and mixed emotion that I prepare this communication bringing to an end my term of employment as your Attorney for the Town of Abingdon. After giving this matter a great deal of thought, I have decided that in my list of life's priorities, I must place myself, my family and the well-being of both in the top position which my career has monopolized for the past nearly eleven (11) years. The treatment I have endured recently is unacceptable. I have had legal representation consistently make requests for accommodations to assist me, all of which were ignored. Further, I learned in May that a male worker was receiving a raise to do the exact same job that I had been doing for years without a pay increase.
>
> I loved my job and worked many extra hours each week to do my best in assisting my fellow Appointees, Employees and Council Members in moving toward making Abingdon one of the most outstanding localities in the Commonwealth of Virginia. When I attended state and national professional meetings it was amazing that

- 16 -

so many local government attorneys paid attention to Abingdon and the issues we were handling. We received many compliments and kind comments regarding the order and procedure observed during our Council meetings. I had a habit of taking reading and work home with me nightly and kept a copy of the Town Code of Ordinances within reach at all times. Serving as your Town Attorney was my "Dream Job" for the first eight (8) years however, unfortunately, I have personally confirmed that the stress of a hostile and cruel political climate can easily become too much to bear and can impact one's health in many detrimental ways. My reputation in my field and my community has been permanently affected by numerous intentional acts of town leadership.  Despite my best efforts, I feel as if there is nothing else that I can do to change this untenable situation. Accordingly, I consider myself to be constructively discharged and am submitting my resignation, effective immediately.

> In closing, I hope that within time the Town of Abingdon can resume its dignity and status as the "Jewel of Southwest Virginia". I wish nothing but great success to the Town of Abingdon and am deeply saddened that I have been forced to end my employment in this manner.

Id. at Ex. 29, Resignation Letter, ECF No. 71-29.

Icenhour's final EEOC charge was filed on July 31, 2018.  This third charge included the following new allegations:

> She never received workplace discipline during the course of her employment with Abingdon, and never experienced a negative comment at all until Council members Craig and Patterson recently asked the H.R. Director to place their individual negative comments in Ms. Icenhour's personnel file on or about early May, 2018, which was during the time she was on FMLA leave for surgery to alleviate a serious health issue.  Ms. Icenhour requested FMLA leave and submitted signed medical forms in mid-April 2018.  Ms. Icenhour would not have been aware of the negative, retaliatory written statements had she not requested a copy of her personnel file.

> Ms. Icenhour suffers disabilities, to-wit, anxiety, depression and metalosis, a toxic blood condition in which exorbitant levels of metals

(cobalt and chromium usually originating from an orthopaedic prosthesis) enter the bloodstream and deprive muscle and bone tissue of oxygen, thereby causing the same to deteriorate. Ms. Icenhour recently utilized additional FMLA leave from her job following an extensive surgical procedure to alleviate this serious disorder. Ms. Icenhour has suffered and continues to suffer from each of the named disabilities as these conditions have been constantly exacerbated due to the often unprofessional and occasionally outrageous actions of several of her supervisors, the Abingdon Town Council Members. Due to the stressful work environment caused by lack of order, discipline, and reliability as well as the ongoing political in-fighting among Council members, Ms. Icenhour's disabilities have been negatively impacted and have affected her daily life activities, her health and quality of life.

Ms. Icenhour has continued to suffer . . . retaliation based on her disability, her [illegible] and for filing Charges of Discrimination. . . .

On January 10, 2018, Ms. Icenhour requested several reasonable accommodations for her disabilities. The Town refused to engage in the interactive process in order to find accommodations to Ms. Icenhour's disabilities. Ms. Icenhour only received a token communication from Abingdon's legal counsel in the matter several months later, on or about April of 2018, stating that the Council of the Town of Abingdon would engage in the interactive process. When Ms. Icenhour attempted to further communicate with the Town concerning the interactive process, she did not receive further reply from the Town Council or its legal counsel in the matter.

Further, Ms. Icenhour served as the Freedom of Information Act ("FOIA") officer for the Town of Abingdon for many years (10 yrs.), in addition to her responsibilities as Town Attorney. Ms. Icenhour was often required to come into work early and stayed late in order to correctly address the many requests received. Unfortunately, due to Ms. Icenhour's complaints about disability discrimination, . . . and filing two (2) prior Charges of Discrimination with the EEOC, the Town Council approved a male employee, Floyd Bailey, to assist with FOIA requests and to become an additional FOIA officer for Abingdon. Upon information and belief, Mr. Bailey essentially replaced Ms. Icenhour. Upon the appointment of Mr. Bailey,

Abingdon's Town Council instantly approved an immediate pay raise for him to perform the duties, although Ms. Icenhour had fulfilled the same duties and had served as Abingdon's FOIA Officer for many years, both before and after such an appointment became a state requirement in 2016.  Ms. Icenhour was never given a pay raise for holding dual positions.  Ms. Icenhour was directed to, and did, train Mr. Bailey in matters related to the Freedom of Information Act, as, upon information and belief, Mr. Bailey had no basis of knowledge in FOIA matters prior to said training. . . .

In addition to her treatment of inequality as the Town's FOIA officer, Ms. Icenhour was subject to extremely unprofessional behavior and retaliation for her previously filed EEOC charges by Town Council Member, Wayne Craig and Cindy Patterson.  Ms. Patterson stigmatized Ms. Icenhour's reputation as a competent professional and FOIA officer by stating to the local newspaper, the Bristol Herald-Courier (hereinafter, "BHC"), that "the citizens don't trust […] the FOIA officer [Ms. Icenhour]."  Ms. Icenhour, as a licensed attorney in the Commonwealth of Virginia and as the Town of Abingdon's FOIA officer, had a legal and ethical duty to respond to FOIA requests appropriately and fully.  With a BHC daily circulation of at least 36,000, Ms. Icenhour's professional reputation was harmed by said unprofessional behavior.  Further, Ms. Patterson's hostile behavior and verbalizations often targeted Ms. Icenhour in public meetings.  Ms. Patterson has singled Ms. Icenhour out on many occasions in an unprofessional and discriminatory matter [sic].  One of the reasonable accommodations requested as referenced above was that the remaining Town Council members acknowledge and intervene when such inappropriate language, directives, threats or blatant accusations from fellow Council members are publicly targeted toward subordinates, especially appointed professionals with advanced educational credentials.  Ms. Patterson did this and targeted Ms. Icenhour on several occasions, however, remaining members of the governing body failed to intervene or in any way mitigate or stop the abuse.  As a Council appointee, Ms. Icenhour felt helpless to launch into defensive disruption of a regular, documented meeting of Council.

As brief examples, in August of 2016 at an open work session in the Town Hall, a somewhat heated discussion among the Council

members ensued regarding a public/private project to which Abingdon was a party. Said discussion led Mr. Wayne Craig to very inappropriately make an open statement/inquiry to Ms. Icenhour to the effect of "Deb [Icenhour], I hear that you are in bed with Food City (the public partner on the project)!?" Further, in February 2017, following Ms. Icenhour's health issue which required surgery and a period of recuperation/rehabilitation, Ms. Icenhour was again faced with a similar verbalization from Mr. Wayne Craig as he openly and very inappropriately inquired about whether her "…estrogen levels were balanced?"

The Mayor and Vice Mayor belittled and isolated Ms. Icenhour when they conferred with Town Manager Greg Kelly about matters within the purview of Ms. Icenhour's job as Town Attorney. The Mayor accused Ms. Icenhour of refusing to provide certain information to the Town Council, however, such accusations were pretextual and were retaliatory and made in bad faith. Ms. Icenhour was constructively discharged from employment on or about July 13, 2018.

Icenhour Dep. Ex. 7, ECF No. 62-1. Icenhour timely filed suit following the EEOC's dismissal of this third charge.

## II.

## A.

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if its existence or non-existence could result in a different jury verdict. *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). When ruling on a summary judgment motion, the court should consider the parties' pleadings, depositions,

answers to interrogatories, admissions on file, and affidavits.  *Celotex Corp. v. Catrett ex rel Catrett*, 477 U.S. 317, 322 (1986).   "'[T]he nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.'"  *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783 (4th Cir. 2021) (unpublished) (quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.2d 532, 540 (4th Cir. 2015)).

"[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits."  *Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2728 (3d ed. 1998)). The court may not assess credibility on a motion for summary judgment.  *Id.* at 569.

Summary judgment is not a disfavored procedural shortcut, but an important mechanism for weeding out claims and defenses that have no factual basis. *Celotex Corp.*, 477 U.S. at 327.  It is the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993).

B.

"A plaintiff may demonstrate retaliation though either direct evidence of retaliation or through the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973),] pretext framework." *Johnson*, 839 F. App'x at 783 (citing *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013)).  Here, Icenhour has produced no direct evidence of retaliation,[1] so we proceed through the familiar *McDonnell Douglas* burden-shifting framework.

To establish a claim of retaliation under the ADA, a plaintiff must show that "(1) [s]he engaged in protected conduct, (2) [s]he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012).  The first element is not contested here; filing a charge of discrimination with the EEOC is protected conduct under the ADA.

---

[1] Rosenbaum testified that after the appointees filed their EEOC charges, Lowe asked Reichler "how could she get rid of us."  Pl.'s Br. Opp'n Mot. Summ. J. Ex. 7, Rosenbaum Dep. 75, ECF No. 71-7.  Kelly similarly testified that Reichler told him, "The mayor just came to see me and inquired in terms of whether or not they could terminate you and make these charges go away."  *Id.* at Ex. 4, Kelly Dep. 194, ECF No. 71-4.  This is inadmissible hearsay that I cannot consider in deciding the Motion for Summary Judgment.  Reichler herself did not so testify.  "Only evidence that would be admissible at trial may be considered for summary judgment purposes." *Hunter v. Prince George's Cnty.*, 36 F. App'x 103, 106 (4th Cir. 2002) (unpublished).  "[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991). The burden is on the proponent of summary judgment material to show its admissibility.  Fed. R. Civ. P. 56(c)(1)(B) advisory committee's note to 2010 amendment.  With respect to these statements, Icenhour has not met that burden.

As for the second element, in the retaliation context, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse," meaning it could have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted). "[I]t is important to separate significant from trivial harms," as federal employment laws do not create "a general civility code for the American workplace." *Id.* (citation omitted). "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not" deter a reasonable worker from engaging in protected activity. *Id.*

Icenhour claims that one of the adverse actions she suffered was a constructive discharge. "The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that [her] working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016) (internal quotation marks and citation omitted). In such a situation, the law will treat the employee's resignation as a discharge. *Id.* at 1776–77.

"In assessing intolerability, the frequency of the conditions at issue is important." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019). "[W]hen

the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." *Id.* But "[t]he more continuous the conduct, the more likely it will establish the required intolerability." *Id.* "Further, difficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to resign." *Id.* The question is not whether resigning was the plaintiff's wisest or best choice under the circumstances, but rather whether a reasonable person in the plaintiff's position "would have had *no choice* but to resign." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 212 (4th Cir. 2019) (internal quotation marks and citation omitted). This standard is higher than the severity or pervasiveness required to prove a hostile environment harassment claim. *Id.*

An ADA retaliation claim requires "but for" causation. *United States ex rel. Cody v. ManTech Int'l, Corp.*, 746 F. App'x 166, 177 (4th Cir. 2018) (unpublished) (citing *Gentry v. E.W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235–36 (4th Cir. 2016)). There are two ways to establish the causation element of a retaliation claim. "First, a plaintiff may establish that the adverse act bears sufficient temporal proximity to the protected activity." *Johnson*, 839 F. App'x at 784. "Second, a plaintiff may establish the existence of other facts that alone, or in addition to temporal proximity, suggests that the adverse employment action occurred because of the protected activity." *Id.* "To avoid summary judgment, the plaintiff must produce direct evidence of a stated purpose to discriminate and/or

indirect evidence of sufficient probative force to reflect a genuine issue of material fact." *Jacobs*, 780 F.3d at 577 (citations omitted). "What is required is evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Id.* at 577–78 (citations omitted).

"Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted). "[W]hen animus already exists between the plaintiff and [her] employer prior to the protected activity at issue, the plaintiff needs to be able to show that [her] protected conduct 'changed' the 'status quo' in some fashion." *ManTech Int'l*, 746 F. App'x at 181 (quoting *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 349 (4th Cir. 2014)).

Claims raised in an EEOC charge are time-barred if not asserted in a federal lawsuit within 90 days of receiving a Notice of Right to Sue letter for the charge. 42 U.S.C. § 2000e-5(f)(1). A number of courts have held that when a plaintiff has filed a series of EEOC charges but has not filed suit within 90 days of dismissal of the earlier-filed charges, the notice of dismissal of the final charge does not serve to revive time-barred claims raised in the earlier charges. *See, e.g., Wade v.*

- 25 -

*Knoxville Utils. Bd.*, 259 F.3d 452, 460 (6th Cir. 2001); *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 203 (E.D.N.Y. 2014); *Woods v. Lancaster Indep. Sch. Dist.*, 834 F. Supp. 2d 512, 516 (N.D. Tex. 2011); *Felix v. City & Cnty. of Denver*, 729 F. Supp. 2d 1243, 1250–51 (D. Colo. 2010).

"[T]he continuing violation theory does not eliminate the requirement that a plaintiff file a judicial action within ninety days of receipt of notice of the right to sue." *Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 926 F.2d 959, 962 (10th Cir. 1991). The continuing violation doctrine, which tolls the statute of limitations for filing a claim with the EEOC, is meant to ensure "that meritorious discrimination claims are not pretermitted because the claimant needed to experience a pattern of repeated acts before she could be expected to realize that the individual acts were discriminatory in nature." *Loubriel v. Fondo del Seguro del Estado*, 694 F.3d 139, 144 (1st Cir. 2012).

> This purpose would not be served by extending the 90-day filing period. . . . By the time that she receives a right-to-sue notice, a claimant is necessarily aware of the defendant's discriminatory conduct; she has by then already recognized the occurrence of discrimination and filed her administrative claim.

*Id.*; *see also Gibbs v. Gen. Motors Corp.*, 104 F. App'x 580, 582 (7th Cir. 2004) (unpublished) ("Gibbs cannot avail herself of the continuing-violation doctrine because she obviously believed that the time-barred acts were discriminatory when she filed EEOC charges in early 2001.").

The Town asserts several grounds in support of its Motion with respect to Icenhour's retaliation claim.  It first contends that Icenhour cannot now complain about incidents she raised in her first two EEOC charges because she did not timely sue on those charges, and those claims are now time-barred.  This argument only goes to the constructive discharge claim.  The other alleged adverse actions — the letter from Craig's personal attorney, the lack of a pay increase in 2018, reduction of FOIA-related responsibilities, and the negative evaluations placed in her personnel file — were raised only in Icenhour's third charge, on which she timely filed suit.

The Town also argues that Icenhour has failed to prove the existence of any adverse action.  Finally, the Town contends that Icenhour has not established a genuine issue of fact as to whether the purported adverse actions occurred because of her protected activity, the filing of EEOC charges.  I will address each alleged adverse action in turn.

1.       Letter from Craig's Personal Attorney.

Icenhour argues that the letter from Craig's attorney threatened her job and thus constituted an adverse action.  The letter stated that Icenhour's continued treatment of Craig's request for documents as a FOIA request would lead him to view her actions as deliberate insubordination and that he would raise the matter at the next Town Council meeting.  Icenhour reported directly to Town Council, and I

find that the letter could reasonably be construed as threatening termination or other disciplinary action.   A threat of termination could certainly dissuade a reasonable person from engaging in protected activity, and it thus qualifies as an adverse action for purposes of a retaliation claim.

However, Icenhour has produced no evidence tying the letter to her protected activity.   Craig's email and his attorney's letter came three months after Icenhour filed her first charge of discrimination and before Craig had notice of her second charge of discrimination.   Craig was upset that he had to wait to receive documents to which he believed he was entitled as a Council member.   The documents related to the controversial Meadows project, which had been important to Craig since before he was elected.   There is simply no suggestion in the record that the December 22, 2017, email from Craig or the related letter that his personal attorney sent to Icenhour had any connection to her protected activity.

### 2.   Denial of Pay Raise.

Being denied a deserved pay increase could dissuade a reasonable person from filing a charge of discrimination, and it therefore qualifies as an adverse action for purposes of a retaliation claim.   Again, however, Icenhour cannot establish that she would have received a pay raise but for her protected activity. The undisputed evidence shows that Icenhour did not receive a pay raise for the 2017-18 fiscal year, which began more than two and a half months before she filed

her first charge of discrimination.  That she again received no pay increase for the 2018-19 fiscal year does not represent any change in the status quo.  She was not awarded a raise before her protected activity, and she was not awarded a raise after her protected activity.   There is no evidence in the record to suggest that Council denied her a pay increase for the 2018-19 fiscal year because she had filed EEOC charges.

### 3.    Appointment of Bailey as Additional FOIA Officer.

A reduction in responsibilities could in some circumstances constitute an adverse action.  Here, however, the undisputed evidence clearly shows that the appointment of Bailey as an additional FOIA officer was not an adverse action. Icenhour testified that the voluminous FOIA requests she was receiving were overly burdensome, and she needed help to ensure timely responses and avoid FOIA violations.  She stated under oath that she welcomed assistance with respect to her FOIA duties.  Icenhour's pay and job title remained the same after Bailey was appointed.  The fact that he received a pay increase for taking on additional FOIA duties bears no relevance to whether his appointment was adverse to her.  It plainly was not.  Moreover, even if the appointment of an additional FOIA officer were an adverse action, it occurred more than three months after she filed her second EEOC charge, and there is no evidence connecting the appointment to Icenhour's protected activity.   Council members Craig and Patterson had been

critical of Icenhour's handling of FOIA requests since they first took office, well before she began engaging in protected activity.

4.     Negative Evaluations by Patterson and Craig.

In general, critical performance evaluations could dissuade a reasonable employee from engaging in the EEOC process, so they can serve as adverse actions in support of a retaliation claim.   But Icenhour was not aware of the negative evaluations written by Patterson and Craig until after she resigned, when she requested her personnel file.   The evaluations had no effect on her employment; she was reappointed Town Attorney for the 2018-19 fiscal year, and Patterson and Craig voted in favor of reappointing her.

Furthermore, there is again no evidence in the record that would tie the negative evaluations to Icenhour's filing of EEOC charges.   She filed her second EEOC charge more than four months before Craig and Patterson wrote their evaluations, and they complained about incidents that had taken place before she filed her first EEOC charge – incidents that they had previously openly criticized.

5.     Constructive Discharge.

Many of the incidents Icenhour cites in support of her claimed constructive discharge occurred before she engaged in any protected activity and thus cannot have been retaliatory.   While she contends these instances show a pattern of abuse,

they in fact cut against her claim of retaliatory constructive discharge, as they show that her employment environment changed little after she filed her EEOC charges.

Even if Icenhour has established that her work environment was so objectively intolerable that she had no choice but to resign, the record is virtually devoid of evidence tying Council members' treatment of her to her EEOC charges. Based on Icenhour's evidence, Lowe, Humphreys, Patterson, and Craig treated her poorly before she filed her EEOC charges, and they continued to treat her poorly after she filed her charges. According to Icenhour's testimony, they did so for their own reasons, such as Humphreys' private business concerns about his bed and breakfast and Patterson's and Craig's political agendas pertaining to the Meadows development.

The lack of details and dates set forth in the record make it difficult to discern whether certain events occurred before or after Icenhour filed her EEOC charges. Testimony generally stating that Council members' behavior worsened after the EEOC charges is too vague and conclusory to raise a genuine issue of material fact. On the record before the court, no reasonable jury could conclude that any constructive discharge which may have occurred would not have happened but for Icenhour's protected activity under the ADA.

In sum, Icenhour has failed to produce evidence sufficient to satisfy the causation element of a prima facie case of retaliation under the ADA. She relies

exclusively on temporal proximity, and viewing the evidence as a whole, gaps of several months between her protected activity and the asserted adverse actions render the proximity too weak to raise an inference of retaliation. Summary judgment in the Town's favor is therefore warranted.[2]

III.

For the foregoing reasons, it is **ORDERED** that the Motion for Summary Judgment, ECF No. 61, is GRANTED. It is further **ORDERED** that Plaintiff's Motion to Exclude Defendant's Expert Witness, ECF No. 63, is DENIED as moot. A separate final judgment will be entered herewith.

ENTER:  September 8, 2021

/s/  JAMES P. JONES
Senior United States District Judge

---

[2]   The plaintiff has filed a motion seeking to exclude the Town's expert witness. In light of my decision, that motion is moot.